IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


UNITED STATES OF AMERICA,

       Plaintiff-Respondent,

  vs.                                     CIVIL NO. 99-394 SC/LFG
                                           CRIM. NO. 97-607 SC

ORVILLE DWYER,

       Defendant-Movant.


## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

1. This is a proceeding on a Motion to Vacate, Set Aside or Correct Sentence pursuant to

28 U.S.C. § 2255, filed April 5, 1999. Movant Orville Dwyer ("Dwyer") attacks the judgment and

sentence entered by the United States District Court for the District of New Mexico in <u>United States</u>

<u>v. Dwyer</u>, No. CR 97-607 SC.

2. Dwyer pled guilty to Count II of the superseding indictment, charging conspiracy to

possess with intent to distribute 100 kilograms or more of marijuana. Judgment was entered on May

13, 1998, and Dwyer was sentenced to 5 years' imprisonment. He did not appeal his conviction.

3. Dwyer asserts as grounds for review: (1) governmental misconduct based on withholding

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommenda-tions. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

of evidence, inflation of the quantity of marijuana in order to increase the penalty, and threats and coercion to induce a guilty plea; (2) ineffective assistance of counsel in that his attorney failed to uncover and preserve exculpatory evidence, persuaded him to perjure himself, and conspired with counsel for a co-defendant to coerce Dwyer to plead guilty; (3) involuntariness of the guilty plea in that the judge did not have a factual basis for accepting the plea in violation of Rule 11; (4) deprivation of his constitutional right to appeal; and (5) unconstitutionality of the Sentencing Reform Act.

### Facts and Procedural History

4. The following factual account is taken from the presentence report prepared in Cr. 97-607. Dwyer's counsel stated at the sentencing hearing that "we agree with all the factual allegations that are made in the presentence report." (Transcript, Final Dispositional Hearing in United States v. Dwyer, CR-97-607, at 7) (hereafter referred to as "Tr. FDH").

5. Dwyer was arrested on September 20, 1997, along with co-defendants David Christopher Williams ("Williams") and Eric Derrick Holliday ("Holliday"). A confidential informant told agents in June and July of 1997 that Williams, a New York drug dealer, was purchasing thousand-pound quantities of marijuana in Texas and New Mexico for distribution in New York. Between June and August, 1997, an undercover agent in Las Cruces made several telephone calls to negotiate the sale of marijuana to Williams in amounts ranging from 1,000 to 1,500 pounds.

6. In these conversations, Williams made arrangements for the undercover agent to meet with his associate, Holliday, in El Paso, Texas, so that Holliday could inspect the marijuana offered for sale by the agent. They met on August 28, 1997. At this meeting, Holliday told the agent that the marijuana looked good and said that Williams wished to purchase approximately 1,000 to 1,500

pounds.   The agent told Holliday that the price of the marijuana was $200,000 for 1,000 pounds. A business card was found on Holliday after his arrest, on which the agent had written a price of $250,000 for 1,000 pounds of marijuana.  In later telephone conversations in August and September, 1997, Williams and the agent discussed the purchase of varying amounts of marijuana, ranging from 400 to 2,500 pounds.

7.  In one of these conversations, Williams told the agent that his driver had some questions, and he put Dwyer on the phone.  Dwyer told the agent that he would be driving a truck and asked if a loading dock and forklift would be available at the location where the marijuana was to be purchased.

8.  On September 19, 1997, Williams called the undercover agent to say that he was in El Paso and wanted to complete the marijuana deal quickly.  He was accompanied by Dwyer and Holliday.  The agent called the confidential informant, who picked Williams up in El Paso and drove him to Las Cruces.  Dwyer and Holliday remained in El Paso.  Williams met with the undercover agent and the confidential informant in Las Cruces and told them he wanted to purchase 500 pounds of marijuana but would start with just 100 pounds, as he had a contact who worked at the airport, ready to transport the 100 pounds two days later.  He gave the agent $5,000 as a deposit and was driven back to El Paso.

9.  The next day, the confidential informant picked up Williams, Dwyer, and Holliday, and they all drove to Las Cruces.  Arrangements were made for the group to meet the agent at a parking lot for purposes of completing the marijuana transaction.  The parking lot was under surveillance. Williams got out of the vehicle at a nearby hotel, and Dwyer, Holliday, and the informant proceeded to the prearranged meeting place.  The undercover agent was waiting for them in the parking lot.

When they arrived, Dwyer and Holliday got out of the car and walked toward the agent. At this point, Dwyer and Holliday were arrested; Williams attempted to flee, but he was caught and arrested.

10. Following his arrest, Dwyer told agents he had flown from New York to Las Vegas with a friend and had run into Williams in the Las Vegas airport. He said that he had been kidnaped and taken to Las Cruces involuntarily. He later amended this statement to say that he accompanied Williams and Holliday to Las Cruces voluntarily, for the purpose of purchasing 100 pounds of marijuana.

11. The business card found on Holliday at the time of his arrest contained the handwritten note of the undercover agent, stating a price for 1,000 pounds of marijuana and noting that an additional 1,500 pounds of marijuana would be given to Williams on consignment.

12. Dwyer initially pled not guilty but later changed his plea to guilty to Count II of the indictment, charging him with conspiracy to possess with intent to distribute 100 kilograms and more of marijuana.[2] A plea hearing was held on January 20, 1998, and sentencing took place on April 6, 1998.

### Cognizability of Claims

A. Failure to Appeal as Barring a § 2255 Action.

13. Dwyer has not appealed, and a defendant who fails to attack his sentence on direct appeal is generally barred from raising the issue in a § 2255 proceeding, unless he can show cause and prejudice or a fundamental miscarriage of justice. United States v. Allen, 16 F.3d 377, 378 (10th Cir. 1994), *citing* United States v. Frady, 456 U.S. 152, 102 S. Ct. 1584 (1982). However, the

---

[2]One kilogram is approximately 2.2 pounds; thus, one hundred kilograms is approximately 220 pounds.

government has not relied on procedural default in this case, and although the habeas court may raise the issue *sua sponte*, <u>Hines v. United States</u>, 971 F.2d 506 (10th Cir. 1992), it need not do so and may proceed to the merits, if a procedural disposition does not serve the interests of judicial efficiency and orderly and prompt administration of justice. <u>Allen</u>, at 379.

14.  The Court will proceed to the merits in spite of Dwyer's default, because he might be able to establish cause for failing to appeal, due to his waiver of appellate rights,[3] and because the parties have already expended considerable resources in litigating the merits. In addition, some of Dwyer's claims are based on ineffective assistance of counsel, which are more appropriately brought in postconviction proceedings than on direct appeal. <u>United States v. Kay</u>, 961 F.2d 1505 (10th Cir. 1992).

B.  <u>Effect of Guilty Plea on Cognizability of Certain Issues</u>.

15.  The Court finds, however, that certain of Dwyer's claims are not cognizable for a different reason. A defendant who voluntarily and intelligently pleads guilty waives all non-jurisdictional defenses, and "[h]aving pleaded guilty, a defendant's only avenue for challenging his conviction is to claim that he did not voluntarily or intelligently enter his plea." <u>United States v. Wright</u>, 43 F.3d 491, 494 (10th Cir. 1994). Thus, the movant is barred from raising claims other than those which go to the knowing and voluntary nature of his plea. <u>Wright</u>, at 494.

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea.

---

[3]The Court does not find it necessary to reach this issue.

United States v. Davis, 900 F.2d 1524, 1526 (10th Cir. 1990), *quoting* Tollett v. Henderson, 411 U.S. 258, 267, 93 S. Ct. 1602, 1608 (1973).

16. As noted below, the Court finds that Dwyer's plea was knowing and voluntary. Thus, the Court will not consider Dwyer's claims that the Assistant United States Attorney and the special agents "lured unsuspecting innocent citizens in the clutches of the government" despite his lack of intent (Claim One, at 13), which appears to raise the defense of entrapment, nor the claim that the agents arrested him without a warrant or probable cause (Claim One, at 15-16). Dwyer "was fully cognizant of the alleged governmental misconduct when he entered his plea. Instead of pursuing these claims further, he decided to accept the prosecution's plea bargain. By doing so, appellant waived any claim [based on the misconduct]." Wright, at 494.

17. However, Dwyer's guilty plea does not bar consideration of his claims that the prosecutor and agents withheld exculpatory information from the grand jury in order to get an indictment, since a claim under Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), alleges behavior on the part of the prosecution which could render a guilty plea involuntary. Wright, at 495. Claims that Dwyer's guilty plea was induced by threats and coercion from the prosecution will be considered, *see* Wright, at 495, as will the claim that the judge did not comply with Rule 11 in taking his plea. Claims regarding "sentencing entrapment" will be considered, as they relate to issues arising after Dwyer pled guilty. Finally, as discussed below, the Court finds that none of the issues raised by Dwyer under the heading of ineffective assistance of counsel is well-taken; these claims will be considered and denied on the merits.

## Governmental and Prosecutorial Misconduct

18. Dwyer makes several claims that the prosecutor and/or law enforcement agents engaged

in misconduct rising to the level of constitutional violations.

A. Failure to Inform Grand Jury of Williams' Alleged Status as an Informant

19. Dwyer alleges that the prosecution colluded with D.E.A. agents to withhold from the Grand Jury the fact that David Williams was a confidential informer and "co-operating source." Dwyer provides no evidence to support the allegation that Williams was a confidential informant, and it is directly contradicted by the record. The presentence report unambiguously characterizes Williams as a target of the investigation. There is nothing in the presentence report, or anywhere else in the record, to substantiate Dwyer's allegation that Williams was a confidential informant and that the government concealed this fact in order to get an indictment. Dwyer clearly accepted the factual basis for the presentence report at his sentencing hearing (Tr. FDH, at 7), and his conclusory allegation that these facts are incorrect does not support his motion for relief from sentence.

B. "Sentencing Entrapment"

Alleged Misconduct by Law Enforcement Agents

20. Dwyer asserts that the government (apparently both the prosecution and law enforcement officers) engaged in "sentencing entrapment"; that is, they inflated the quantity of marijuana involved in the crime "in a pre-arranged plan to 'Ratchet Up'" the penalty Dwyer would face under the Sentencing Guidelines. He claims that, even if there had been a conspiracy to purchase marijuana, the largest amount he could purchase was 50 pounds, rather than the 100 kilograms (approximately 220 pounds) charged in the indictment and which formed the basis for his sentence.

21. The Tenth Circuit analyzes sentencing entrapment claims under the "outrageous governmental conduct" test. United States v. Lacey, 86 F.3d 956, 963 (10th Cir. 1996). The inquiry under this test is whether, considering all surrounding circumstances, the government's conduct is

so "shocking, outrageous and clearly intolerable" that it offends "the universal sense of justice." United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992), *citing* United States v. Russell, 411 U.S. 423, 93 S. Ct. 1637 (1973).  Outrageous governmental conduct is "an extraordinary defense reserved for only the most egregious circumstances."  Mosley, at 910.  The behavior of government agents in this case does not meet that standard.

22. Dwyer admitted that he participated in a conspiracy with Williams to purchase marijuana. He thereby became responsible for all of the acts of the other members in furtherance of the conspiracy.  "Acts attributable to any member of the conspiracy are attributable to all other members."  United States v. Mendoza-Salgado, 964 F.2d 993, 1006 (10th Cir. 1992).  Even if a defendant does not have knowledge of all the details, or even all the members of the conspiracy, and may have played only a minor role, he will nevertheless be liable for all reasonably foreseeable acts of his co-conspirators in furtherance of the conspiracy.  Id., at 1005; United States v. Brewer, 983 F.2d 181 (10th Cir. 1993).  In addition, the Sentencing Guidelines provide that a member of a conspiracy will be sentenced in accordance with all "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3(a)(1)(B).

23. The presentence report on Dwyer computed his base offense level under the Sentencing Guidelines to be 26, the appropriate level for at least 100 but less than 400 kilograms (*i.e.*, approximately 220-880 pounds) of marijuana.  This amount was based on the fact that, although the offense involved negotiations for 2,500 pounds of marijuana, the "negotiated amount" at the time of Dwyer's involvement was 500 pounds or 226.8 kilograms of marijuana.  (Presentence Report, at 9).

24. Dwyer affirmative acknowledged that the presentence report was factually correct.  That

report establishes that, in the course of conversations between Williams and the undercover agent, the following amounts were discussed: 1,000 to 1,500 pounds, between June 27 and August 27, 1997; 1,000 pounds on August 28; 1,000 pounds plus an additional 500 pounds, also on August 28; 2,500 pounds on August 29; and amounts in other conversations, for which the presentence report does not give dates, of 1,000 pounds, 1,500 pounds, and 400 to 500 pounds. (Presentence Report, at 4-5). The report concludes that, at the time Dwyer was involved in the conspiracy, the negotiated amount was 500 pounds of marijuana.

25. Even the smallest of these amounts is greater than the 220 pounds necessary to sustain Dwyer's sentence. The only evidence on the record that any amount smaller than 220 pounds was part of the negotiations is as follows. On September 19, 1997, at a meeting between Williams, the undercover agent, and the confidential informant, Williams stated that he wanted to buy 500 pounds of marijuana, but would initially purchase only 100 pounds which was to be shipped out by a contact of his who worked at the airport. He stated he had brought some money with him to the meeting and would bring more later. Later in this conversation, Williams said he would pay for 300 pounds of marijuana and would take an additional 200 pounds and pay for it later.

26. Whether or not Dwyer was aware of it, his co-conspirator was negotiating to purchase large amounts of marijuana. At only one point did Williams say that he wanted to purchase as small an amount as 100 pounds, and the record shows that the amount intended to pass hands in the transaction as finally negotiated was 500 pounds, with the 100 pounds being an initial purchase toward the total. Given the fact that the government is required to prove drug quantity for sentencing purposes only by a preponderance of the evidence, and the fact that Williams' actions are attributable to Dwyer as a co-conspirator, the record clearly establishes an attempt by the conspirators to

purchase marijuana in the amount of 100 kilogram amounts or more, with no evidence of "outrageous conduct" on the part of law enforcement agents to inflate that amount. This is not the extraordinary case requiring application of the "outrageous conduct" principle.

## Alleged Misconduct by Prosecutor

27. Nor is there any evidence that the prosecutor engaged in "sentencing entrapment" or sentence manipulation. At the plea hearing, Dwyer admitted that he had an agreement with Williams and Holliday to possess marijuana with intent to distribute. The judge asked him whether this agreement involved possession with intent to distribute 100 kilograms or more of marijuana. Dwyer responded, "One hundred pounds, not 100 kilograms." (Transcript of Plea Hearing, January 20, 1998, in State v. Dwyer, No. Cr. 97-607 SC, at 40-41) (hereafter referred to as "Tr. PH").

28. At this point in the plea hearing, the prosecutor explained that the agreement was to purchase 1,000 pounds of marijuana, but that the conspirators came to possess 100 pounds of it as a first shipment only, and that several other shipments were to follow; thus, the conspiracy involved more than 100 kilograms of marijuana. Dwyer stated that his knowledge of the agreement involved 100 pounds on September 19th, and nothing further. The judge informed Dwyer that his participation in the conspiracy, which he admitted, rendered him accountable for the full quantity of marijuana which any of his co-conspirators intended to possess. (Tr. PH, at 41). The judge accepted the plea.


29. The prosecutor did nothing more than restate the facts set out in the presentence report, and Dwyer had already acknowledged the accuracy of those facts at the plea hearing. There is nothing on the record to show "outrageous conduct" on the part of law enforcement agents or the prosecutor, and Dwyer's "sentencing entrapment" claim must be rejected.

C. <u>Threats and Coercion to Induce a Guilty Plea</u>

30. Dwyer asserts that the Assistant United States Attorney prosecuting this case used threats and promises to coerce him to sign the plea agreement, including threats to bring additional charges and to assert career criminal status, threats to enhance penalties up to life in prison, and threats to use Dwyer's co-defendants Williams and Holliday to testify falsely at trial to ensure a guilty verdict against Dwyer.

31. "A valid guilty plea may not be obtained through coercion," <u>Osborn v. Shillinger</u>, 997 F.2d 1324, 1327 (10th Cir. 1993), and "the agents of the State may not produce a plea by actual or threatened physical harm or by mental coercion overbearing the will of the defendant." <u>Brady v. United States</u>, 397 U.S. 742, 750, 90 S. Ct. 1463, 1470 (1970) (affirming the Tenth Circuit and District of New Mexico decisions). However, ordinary plea negotiations, including threats by the prosecutor to seek maximum punishment or to bring additional, justified charges if the defendant does not plead guilty, do not offend due process. <u>Hardiman v. Reynolds</u>, 7 F.3d 1045 (Table, text in Westlaw), No. 93-6109, at *1 (10th Cir. Sept. 22, 1993), *citing* <u>United States v. Goodwin</u>, 457 U.S. 368, 377-80, 102 S. Ct. 2485, 2490-92 (1982), *and* <u>Bordenkircher v. Hayes</u>, 434 U.S. 357, 361-65 98 S. Ct. 663, 666-69 (1978).

32. Dwyer alleges that the prosecutor threatened enhanced penalties, threatened to bring additional charges, and threatened career criminal status, in an effort to convince him to plead guilty. These actions do not amount to unconstitutional coercion, as long as the prosecutor had probable cause for bringing the additional charges and a factual basis for raising prior convictions.

> Plea bargaining flows from "the mutuality of advantage" to defendants
> and prosecutors, each with his own reasons for wanting to avoid trial
> . . . Defendants advised by competent counsel and protected by other

11

procedural safeguards are presumptively capable of intelligent choice in response to prosecutorial persuasion . . .. Indeed, acceptance of the basic legitimacy of plea bargaining necessarily implies rejection of any notion that a guilty plea is involuntary in a constitutional sense simply because it is the end result of the bargaining process . . . While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable' – and permissible – "attribute of any legitimate system which tolerates and encourages the negotiation of pleas" . . . It is not disputed here that [the defendant] was properly chargeable under the recidivist statute, since he had in fact been convicted of two previous felonies. In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.

Bordenkircher, 434 U.S. at 363-65.

33. Dwyer was originally charged in a two-count indictment. In accordance with the plea agreement under which Dwyer agreed to plead guilty to Count II, the government agreed to forgo filing a sentencing enhancement under 21 U.S.C. § 851, which provides for increased punishment for prior convictions. In 1983, Dwyer was charged in New York with grand larceny, criminal possession of stolen property, and unauthorized use of a motor vehicle, but pled guilty to a charge of disorderly conduct. In 1985, he was convicted of criminal possession of a controlled substance and criminal possession of a weapon in connection with his negotiating the sale of cocaine to an undercover officer, while displaying about 1 kilogram of cocaine to the officer and carrying a loaded .38 caliber revolver in his coat pocket. He served two years in prison for these offenses. At the time of his guilty plea, he was subject to pending charges in Michigan for possession with intent to distribute hashish oil, and in New York for criminal possession of a defaced weapon and a loaded gun. Warrants were issued in both states. (Presentence Report, 10-12).

34. If Dwyer had not accepted the plea agreement and had been convicted under both counts of the indictment, and if the government had filed an enhancement information under 21 U.S.C. § 851, Dwyer would have faced additional penalties of 5 to 40 years on Count I, 10 years to life on the enhanced information, as well as substantial fines and additional terms of supervised release. If the prosecutor threatened enhanced penalties, up to life in prison, as Dwyer alleged, this was a well-founded threat and did not amount to coercion.

35. Dwyer also asserts that he was subject to threats by the prosecution, through his attorney, to have Williams and Holliday testify falsely at trial to ensure a verdict against Dwyer, in an effort to coerce him to plead guilty.[4] Dwyer does not specify the nature of the perjured testimony with which he was allegedly threatened; presumably, it would have been something which maximized Dwyer's role in the conspiracy while minimizing the co-defendants' responsibility.

36. A threat by the prosecution to use perjured testimony to secure a conviction is not within the realm of proper plea bargaining. When governmental misconduct induces a guilty plea, and the motion and record in the case do not "conclusively show that the prisoner is entitled to no relief," 28 U.S.C. § 2255, an evidentiary hearing is proper to determine whether the threats were in fact made, United States v. Estrada, 849 F.2d 1304, 1306 (10th Cir. 1988), as the court is obliged to consider all of the relevant circumstances surrounding entry of the plea. Brady v. United States, 397 U.S. at 749.

37. The present case does not present circumstances compelling an evidentiary hearing. In Estrada, the movant made ambiguous statements at the plea hearing which led to the court to

_____

[4]He makes a similar allegation under his claim of ineffective assistance of counsel, asserting that his attorney conspired with the attorney for co-defendant Holliday to use Holliday's false testimony at trial if Dwyer refused to accept the guilty plea. [Doc. 1, at 18]. This claim is discussed below.

question whether his plea was voluntarily made. In addition, he provided a witness to "the critical conversation" between his attorney and the prosecutor which tended to confirm movant's allegation that his attorney joined with the prosecutor in improperly pressuring him to plead guilty.

38. Neither factor is present here. Dwyer alleges that the prosecution threatened him with unfavorable perjured testimony, and that his attorney joined in the threat; however, his allegations are "unsupported by specifics," Blackledge v. Allison, 431 U.S. 63, 74, 97 S. Ct. 1621, 1629 (1977), and unconfirmed by witnesses. In addition, Dwyer stated at his plea hearing that no one had threatened or forced him to plead guilty (Tr. PH, at 29-30), and "solemn declarations in open court carry a strong presumption of verity." Id. A defendant's statements at a plea hearing should be regarded as conclusive in the absence of believable evidence that the statements were not made voluntarily. Hedman v. United States, 527 F.2d 20, 22 (10th Cir. 1975). When asked whether anyone had threatened or forced him to plead guilty, he initially answered, "Yes, sir." The Court said "Pardon me?" and Dwyer responded, "Sorry – no, sir. No threats." (Tr. PH, at 29-30). This is not ambiguous, and Dwyer has presented nothing other than an unsupported allegation in support of the claim that he was coerced by threats of perjury.

### Noncompliance with Rule 11

39. Dwyer claims that his guilty plea was invalid in that the District Judge failed to establish a factual basis for the plea. He notes that in his "acceptance of responsibility" statement, he admitted that he was with Williams and Holliday in El Paso on September 20, 1997, that they were there to purchase 100 pounds of marijuana, and that he accompanied them to Las Cruces to pick up the marijuana, realizing that he was breaking the law in doing so. He pled guilty to the charge of conspiracy to possess with intent to distribute 100 kilograms or more of marijuana.

40. His argument focuses on the fact that he admitted to involvement in a deal involving 100 pounds of marijuana, whereas he was charged in the indictment, and pled guilty to, a charge involving 100 kilograms (approximately 220 pounds) of marijuana. He claims that he thought he was only pleading to a charge involving 100 pounds, and no one informed him that it was actually 100 kilograms.

41. Fed. R. Crim. P. 11(c)(1) provides that, prior to accepting a guilty plea, the court must inform the defendant of "the nature of the charge to which the plea is offered." The record shows that Dwyer was informed by the court, at the plea hearing, that the charge to which he was pleading guilty involved an agreement to possess with intent to distribute 100 kilograms or more of marijuana. He acknowledged that the understood the charge. (Tr. PH, at 18).

42. Later in the plea hearing, the following exchange took place between Dwyer and the judge:

THE COURT: Mr. Dwyer, how do you plead to Count II of the superseding indictment filed against you, guilty or not guilty?

DWYER: Guilty.

THE COURT: Before I accept your plea of guilty to Count II, I want you to tell me, Mr. Dwyer, what you did in connection with the charge there?

DWYER: I had knowledge that Mr. Williams was going to possess marijuana.

THE COURT: Pardon me?

DWYER: I had knowledge that Mr. Williams was going to possess marijuana.

THE COURT: Let's see – did you agree with somebody else to possess marijuana? This Count II charges that you had an agreement with either Mr. Williams or Mr. Holliday to possess with intent to distribute. Did you have such an agreement or arrangement?

DWYER: Yes, sir.

15

THE COURT:  And did this agreement occur sometime between August 26, 1997 to on or about September 20, 1997, in Doña Ana County?

DWYER:  I only know about September 19 – September 19, 1997.  I don't know nothing else about it.

THE COURT:  About when did this – about when did you have this agreement with these other –

DWYER:  September 19th.

THE COURT:  September 19th?  All right; and did the agreement involve possession with intent to distribute 100 kilograms or more of this marijuana?

DWYER:  One hundred pounds, not 100 kilograms.

THE COURT:  Pardon?

DWYER:  One hundred pounds, not 100 kilograms.

THE COURT:  One hundred pounds?

DWYER:  One hundred pounds.

THE COURT:  Well, that's less than 100 kilograms.  Mr. Martin?  [Martin is the Assistant U.S. Attorney].

MARTIN:  Your Honor, during the course of the conspiracy, Mr. Williams was engaged in conversations with Special Agent Louis Medina with the D.E.A.  The agreement was to purchase 1,000 pounds of marijuana.  On the 19th, they came to possess 100 pounds of it as a first shipment.  Several shipments were to follow.  So the conspiracy was involving more than 100 kilograms.

THE COURT:  Do you know anything about that agreement, Mr. Dwyer?

DWYER:  I know about 100 pounds on September 19th, and for some reason they couldn't get it done on September 20th, and we were arrested on that day.  That's what I know about.

THE COURT:  Well, if you were part of a conspiracy – and you have agreed that there was an agreement – and another of the conspirators intended that the amount or quantity would be 1,000 pounds, that would bring you into the conspiracy, Mr. Dwyer.  All right, thank you, Mr. Martin.

(Tr. PH, at 39-41).  Nothing further was said on the "factual basis" issue.

43. Rule 11(f) requires that the judge "should not enter a judgment upon such plea [of guilty] without making such inquiry as shall satisfy it that there is a factual basis for the plea." The district court is to "consider the stipulation, the results of the presentence report and any other pertinent information in determining a factual basis for the sentence." United States v. Soria, 172 F.3d 879 (Table, text in Westlaw), No. 98-6265, 1999 WL 111167, at *2 (10th Cir. Mar. 4, 1999).

44. It is clear that the trial judge did all that was required of him under Rule 11 to inform Dwyer of the charge against him and to satisfy himself that there was a factual basis for the plea. He ascertained that Dwyer admitted to involvement in the conspiracy, and there was evidence on the record as to the amounts of marijuana negotiated by the conspirators. In addition, the fact that Dwyer had spoken with an agent on the phone and inquired about a forklift and loading dock establishes not only that he was part of the conspiracy but also indicates his awareness that Williams was negotiating a transaction involving a large amount of drugs. Dwyer complains that no one explained to him that he was pleading guilty to a conspiracy involving 100 kilograms; however, Judge Campos did in fact explain to him that he was responsible for the larger amount, because of his admission to involvement in the conspiracy. Judge Campos also clearly explained the charge against him and the 5 to 40 year sentence it carried. (Tr. PH, at 18, 22). In addition, the plea agreement shows that Dwyer was aware of the possible penalties he faced.

45. The record refutes Dwyer's complaint concerning a violation of Rule 11. However, even if a technical violation of Rule 11 had occurred, which this Court does not find, "collateral relief is not available when all that is shown is a failure to comply with the formal requirements of the Rule." United States v. Timmreck, 441 U.S. 780, 785, 99 S. Ct. 2085, 2088 (1979). To justify relief under § 2255, a Rule 11 omission must result in a "complete miscarriage of justice or in a proceeding

inconsistent with the rudimentary demands of fair procedure." Id. Considering the record as a whole, as described above, the Court finds no basis for Dwyer's claim that the plea colloquy resulted in a "complete miscarriage of justice."

46. To the extent Dwyer's claim under this heading relates to failure of his attorney to explain to him that he was pleading to a charge involving 100 kilograms, the Court finds no ineffective assistance of counsel. Under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), which applies to guilty plea challenges based on ineffectiveness claims, Dwyer must establish that his attorney's performance was deficient and that the deficient performance prejudiced his defense. To prove deficient performance, Dwyer must over the presumption that counsel's conduct was constitutionally effective. Duvall v. Reynolds, 139 F.3d 768, 776 (10th Cir.), *cert. denied*, 525 U.S. 933, 119 S. Ct. 345 (1998).

47. Dwyer supplies no support for the allegation that his attorney did not explain to him that he was responsible for the 100-kilogram amount. Conclusory allegations unsupported by specifics do not justify postconviction relief based on ineffective assistance of counsel. Eskridge v. United States, 443 F.2d 440, 443 (10th Cir. 1971). In addition, it is Dwyer's burden to establish prejudice; that is, he must show a reasonable probability that, if counsel had more fully informed him of the charges and penalties, he would not have pled guilty but would instead have insisted on going to trial. United States v. Gray, 182 F.3d 762, 768 (10th Cir. 1999). Even if he were unclear on the amounts, Dwyer was aware of the penalties he faced. He signed the plea agreement in which the penalties were clearly spelled out, and in doing so acknowledged that "I have read this agreement and carefully reviewed every part of it with my attorney. I understand the agreement and voluntarily sign it." At the plea hearing, he acknowledged his signature on the plea agreement, (Tr. PH, at 32), and Judge

Campos clearly explained the charges against him. (Tr. PH, at 18).

> Because defendant had full knowledge of the consequences of his
> plea, we conclude that defendant has not shown that his counsel's
> performance was so deficient that he was not functioning as counsel
> guaranteed by the Sixth Amendment.

United States v. Rice, 98 F.3d 1350 (Table, text in Westlaw), No. 96-5015, 1996 WL 570418, at *2

(10th Cir. Oct. 7, 1996).

48.  In addition, Dwyer received a substantial benefit from the plea agreement, in that the

government dropped one charge against him, agreed not to file a sentencing enhancement based on

his prior convictions, and agreed not to bring additional charges arising out of conduct then known

to the government.  He received a reduction of three levels from his base offense level for "clearly

demonstrat[ing] a recognition and affirmative acceptance of personal responsibility for his criminal

conduct."  Without these concessions, Dwyer could have faced life imprisonment.  He has failed to

establish that he would have rejected the plea agreement if he had been informed that he was pleading

guilty to a conspiracy involving 100 kilograms, rather than 100 pounds, of marijuana.

### Ineffective Assistance of Counsel

49.  Dwyer makes several claims of ineffective assistance.  As noted above, the two-part test

of Strickland v. Washington, applies to challenges to guilty pleas based on ineffective assistance of

counsel.  Hill v. Lockhart, 474 U.S. 52, 58, 106 S. Ct. 366, 370 (1985).  Under Strickland, Dwyer

must show that his attorney's performance was deficient and that he was prejudiced by this poor

performance in that there is a reasonable probability that, but for the errors, he would not have pled

guilty and would instead have insisted on going to trial. Hill v. Lockhart, at 59.  "A defendant making

an ineffectiveness claim on a counseled guilty plea must  identify particular acts and omissions of

counsel tending to prove that counsel's advice was not within the wide range of professional competence." Moore v. United States, 950 F.2d 656, 660 (10th Cir. 1991).

50. Dwyer makes his ineffective assistance assertions in a number of paragraphs under Claim Two. In some of these paragraphs, it is somewhat difficult to identify exactly what Dwyer's complaints entail, but the Court will liberally construe these *pro se* pleadings. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). The first two paragraphs constitute an assertion that his attorney persuaded him to plead guilty when it would have been in his best interest to go to trial. He claims that his attorney failed to preserve his right to trial, and persuaded him to make a perjured statement in connection with his guilty plea by telling him the statement was necessary in order for the plea to be accepted.

51. Dwyer attached a copy of the allegedly perjured statement to his motion. The same statement is reproduced in the Presentence Report as the basis for the adjustment for acceptance of responsibility recommended by the U.S. Probation Office. (Presentence Report, at 8-9). Dwyer does not specify what portion of this statement is untrue and constitutes perjury – Is it the amount of marijuana? Is it that he did not accompany Williams and Holliday voluntarily? Is it that he was not involved at all in the conspiracy? As noted above, the drug amount which forms the basis of his sentence is determined from the overall record, not just from Dwyer's statement alone, and the record supports a negotiated amount greater than 100 kilograms. If Dwyer is claiming that he is actually innocent, this assertion is clearly belied by the record. He spoke on the phone to an undercover agent, told him he would be driving the vehicle to be used in the conspiracy to purchase, and asked about a loading dock and fork lift. He was present at several points in the purchase negotiation and was arrested at the agreed-upon site where the negotiated drug transfer was to occur. The Court

finds that Dwyer's statement accepting responsibility was not the result of ineffective assistance of counsel.

52.  Dwyer next asserts that his attorney was ineffective in failing to secure exonerating statements from his co-defendants, stating that Dwyer was not part of any conspiracy.  He does not supply affidavits from the co-defendants, nor does he point to any other evidence to support his statement that he was not involved in the conspiracy and that his co-defendants would have so testified if he had gone to trial.  He also makes a similarly unsupported statements that his attorney failed to interview "numerous favorable witnesses who could have provided exculpatory evidence." He does not state who these witnesses are, or what they would have said if called at trial.  These bald assertions do not support his claims of ineffective assistance.

53. Dwyer next faults his attorney for failing to file a motion to suppress a statement obtained from him in violation of the Fourth Amendment.  He does not give any specifics as to what this statement contained, when it was given, or how his constitutional rights were violated.  The presentence report states that, following his arrest and after being advised of his rights, Dwyer gave a statement to agents to the effect that he was kidnaped and taken to Las Cruces involuntarily.  Other than his statement accepting responsibility, this is the only statement by Dwyer reflected in the record. This statement did not reflect well on Dwyer's credibility, especially since Williams had put Dwyer on the phone in an earlier conversation, to speak with an undercover agent about arrangements for picking up and transporting the marijuana.  However, the statement was not inculpatory, and any failure by his attorney to have it suppressed would not have changed the outcome of the proceedings.

54.  Dwyer next claims that his attorney was ineffective in failing disqualify himself, or to

inform the court, when statements were made by the agents at the "debriefing interview" in which they admitted "they might not be able to convict Dwyer, but they are sure to retrieve information based on Dwyer background." The Court has difficulty determining exactly what Dwyer is alleging here but sees no constitutional violation in a statement by agents that they "might not be able to convict Dwyer." This is true in any criminal proceeding.

55. Dwyer also charges his attorney with breach of the duty of undivided loyalty to his client. He claims that his lawyer conspired with Holliday's lawyer to coerce Dwyer to accept the plea by threatening to have Holliday testify falsely at trial. Dwyer made a similar claim, discussed above, that the prosecution made "Threats by way of Court Appointed Attorney to use David C. Williams, one Eric Holliday to testify at trial if need be, and 'They will testify falsely to ensure a verdict [emphasis omitted].'" As noted above, he has provided no specifics for this claim. Unlike the defendant in Estrada, *supra*, he did not provide a witness who could verify that the threats were made nor did he alert the judge at his plea hearing to any problem with coercion by his attorney. Dwyer has not met his burden of showing that he was deprived of effective assistance of counsel because of attorney disloyalty and coercion.

56. Finally, Dwyer asserts that his attorney failed to object to the fact that court that convicted him had no jurisdiction, in that it was not an Article III court. This Court takes judicial notice that Judge Campos is an Article III judge, and Dwyer's conviction was rendered by a court established by authority of Article III of the Constitution. It is not ineffective assistance to fail to pursue meritless theories. United States v. Kramer, 168 F.3d 1196, 1202 (10th Cir. 1999).

## Deprivation of Right to Appeal

57. Dwyer contends that his plea bargain violates his constitutional rights in that it deprives

him of his right to appeal. In the plea agreement, Dwyer acknowledged that he was aware of his right to appeal, and that he knowingly waived the right to appeal any sentence or the manner in which that sentence was determined, so long as it was within the maximum provided by law.[5]

58. At the plea hearing, Dwyer acknowledged his signature on the plea agreement. Dwyer's waiver of his right to appeal was not mentioned in the course of the plea hearing; however, at the sentencing hearing, the judge stated in open court his finding that Dwyer waived his right to appeal the sentence, pursuant to the plea agreement. (Tr. FDH, at 11). Neither he nor his counsel objected to the finding that, by signing the plea agreement, Dwyer had waived his right to appeal.

59. "This court will hold a defendant to the terms of a lawful plea agreement . . . A defendant's knowing and voluntary waiver of the statutory right to appeal his sentence is generally enforceable." United States v. Atterberry, 144 F.3d 1299, 1300 (10th Cir. 1998); United States v. Fortier, 180 F.3d 1217, 1223 (10th Cir. 1999). The Court has already found that Dwyer's plea agreement was not involuntary as lacking a factual basis, and that it was not the product of coercion by the government, nor of ineffective assistance of counsel. Although it would have been preferable for the judge to question Dwyer explicitly at the plea hearing as to his understanding of his right to appeal and his waiver thereof, the lack of such colloquy does not render the plea involuntary. United States v. Michelsen, 141 F.3d 867, 871-72 (8th Cir.), *cert. denied*, 525 U.S. 942 (1998). The judge reminded Dwyer at his sentencing hearing that he had waived his right to appeal the sentence, and

---

[5]Dwyer also waived his right to collaterally attack his sentence under § 2255 or otherwise. (Plea Agreement, at 5-6). Such a waiver, if enforced, would eliminate this proceeding entirely. The Tenth Circuit has not determined whether, or under what circumstances, such a waiver can be enforced. *See*, United States v. Vasquez, No. 99-2083, 1999 WL 795266, at *1 (10th Cir. Oct. 6, 1999); *but see*, United States v. Bencomo, No. 96-2220, 1997 WL 678371, at *1 (10th Cir. Oct. 16, 1997). In any case, the government has not raised this issue, and the Court will not do so *sua sponte*. *See*, Latorre v. United States, 193 F.3d 1035, 1041-42 (8th Cir. 1999), Lay, J., dissenting.

neither he nor his attorney raised any objection.

60.  The Court finds that Dwyer's waiver of his right to appeal was knowing and voluntary, and enforcement of the waiver does not violate his constitutional rights.

## Unconstitutionality of the Sentencing Reform Act

61.  The United States Supreme Court and the Tenth Circuit have both rejected challenges to the constitutionality of the Sentencing Reform Act.  Mistretta v. United States, 488 U.S. 361, 109 S. Ct. 647 (1989); United States v. Thomas, 884 F.2d 540, 543 (10th Cir. 1989).

62.  Dwyer specifically challenges the validity of the Act on grounds that Congress provided that it would  become null and void after 100 days.  Dwyer cites no support for this argument, and the Court finds it frivolous.

## Recommended Disposition

That the motion be denied and the case be dismissed with prejudice.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge